The United States Court of Appeals for the Federalist Circuit is now open and in session. God save the United States and this honorable court. Thank you and good afternoon. We're very pleased and honored to have sitting with us this afternoon Judge Andrew Guilford of the Central District of California. The first case is Beckler, you'll have to help me with the pronunciation, Beckler v. Department of Interior, Mr. Thompson. You got the pronunciation correct, Ron. Okay, thank you. May it please the court. The issues in this Whistleblower Protection Act appeal essentially or principally derive from the petitioner Dan Beckler's claim of whistleblower reprisal, which is treated as an affirmative defense. The administrative judge below structured her decision in such a way that the principal issue in this appeal is whether the agency sustained its burden from an evidentiary perspective, approving by a clear and convincing standard that it would have terminated or taken the same action with regard to Mr. Beckler that it did. But wouldn't the agency have done that because he was indicted for an offense? Well, Your Honor, first of all, certainly this cast of characters would have done the same thing. I think that the appropriate inquiry is not just whether these people would have taken the same action, but whether reasonably and correctly and legally and lawfully the same action would have been taken. As the respondent agrees, the filing and presentation of an appeal with the Merit Systems Protection Board in terms of cooperating and providing information to the Office of the Inspector General is protected conduct under 5 U.S.C. Section 2302B9. Well, of course, I agree with that. But may I ask, how serious was the whistleblowing? Was this just a comment to some politicians passing through that too much money was being spent, which seems to me to be typical and ordinary? Or was it a more serious whistleblowing? And what was the ultimate result of the whistleblowing if we know of any? Well, Your Honor, in terms of the whistleblowing, the substance of the whistleblowing, it actually goes back a ways. But suffice it to say, and I think it's important to note, that during the summer of, excuse me, during the entire year of 2003, a 2002 filed Merit Systems Protection Board Whistleblower Act case was pending. Some of these whistleblower, underlying factual whistleblower type complaints with regard to waste, governmental inefficiency, and those other statutory classifications of protected disclosures were made and addressed. But in this prior case, there was a prior case that was going to trial on October 2nd and 3rd, 2003 in the federal courthouse in Billings, Montana. During that entire summer preceding that time, Mr. Beckler had been in contact with Special Agent Wood of the BLM, conveying to him specific instances of waste inefficiency and gross inefficiency, gross waste, and a number of types of substantive allegations that are in the record. The important thing, though, is Mr. Beckler considered that his communications with Special Agent Wood were confidential. They were whistleblower communications. Special Agent Wood was detailed by Special Agent Linda Moon from Washington, D.C., of the DOI, OIG, and Office of Inspector General to interact with Mr. Beckler and to conduct an investigation based on his allegations. There's emails in the record, and we cite them. He does complain that Special Agent Wood then also participated in the search with the warrant, but I can't see where he says how he had been prejudiced by the fact that it was the same investigator who responded to various requests for investigation. When one is making protected disclosures to a particular individual who then interacts with other BLM employees, and it's important to note that the search at Mr. Beckler's house occurred on September 12, 2003. That was the day before Mr. Boatner was due to leave. Mr. Boatner figured prominently in the prior case. He knew he was going to have to testify in two weeks or so, a little over two weeks. And they'd been deposed at length that preceding spring. The essence here, and I think underlying all of the issues that are implicating this appeal, is the fact that the board failed to acknowledge, the AJ and then the board, failed to acknowledge or address the circumstantial evidence, which was attendant to the facial fact that Dan Beckler was charged with criminal offenses. It's as if, well, he's charged with these criminal offenses, and therefore we make this decision. The search warrant stopped such things as a Hustler magazine, when the purchase order form cut out of two places, the credit card belonging to Thomas Boatner. I mean, basically the information came from Boatner and Mr. Beckler's ex-wife, who had left Mr. Beckler and their child to join Mr. Boatner's best friend. But the issues that were before the Ninth Circuit, really we have no authority to review the proprietary of the search warrant. I assume these points were raised at the time? Your Honor, I argued, I actually did the appeal. And I would argue that they weren't, they were not addressed. And I didn't do the trial work in the criminal case. That was done by a Montana lawyer. Well, we have the trial as it was. This was the subject, was it not, the validity of the search warrant? No, Your Honor. Well, validity of the search warrant, apparently, according to the Ninth Circuit, was not properly preserved by the trial counsel. So that was not addressed. The role of Mr. Boatner in procuring the search warrant, or assisting in the procurement of the search warrant, was considered to be irrelevant within that context. Within the setting that we're talking about here, there's no question that what we have here is, two weeks away from this hearing, we have the principal protagonist, one of two of them, probably the highest person up on the pyramid in terms of the conduct that was perpetrated against Mr. Becker based on his allegations at the time. And by the way, that survived the jurisdictional challenge of limited merits and eventually was appealed to this court and affirmed. But the bottom line here is there was this conduct that was, there was this overlay and there was a circumstantial evidentiary pattern here where Boatner, being involved in deposition, was very angry. He testified in this case, or excuse me, in the prior case, the deposition testimony was addressed with him, that he wanted Mr. Becker punished for causing the agency all this trouble. Now, are those the particular disclosures that are at issue with regard to these two suspensions? No, but they provide a factual predicate for them. And so you have somebody who has an animus against Mr. Becker. Mr. Becker was a 30-year employee. But you didn't answer my first question, at least in a manner that I understood it. Why wasn't the agency entitled to discipline Mr. Becker because he was indicted for a crime? Isn't that within the law and weren't they entitled? To be as specific as possible. The agency is not entitled to discipline Mr. Becker, for the basis of the discipline unquestionably derives from the criminal charge that protagonists in the agency such as Boutner procure, in essence. And that's the point that I was trying to make. In other words, you're challenging here the validity of the indictment? No, I'm not. And merely because there's an indictment. That doesn't assuage, and that's in the decision law with regard to, in the section of our brief with regard to vindictive and selective prostitution. Just the mere fact that there was a resulting charge and indictment by a grand jury, and even a conviction, by the way, it was a misdemeanor conviction, it was a decision that Mr. Becker made in the face of federal sentencing guidelines, knowing that he had a child who was 15 years old. He has resigned, is that right? No, Your Honor. He passed his mandatory age of retirement. He was a wildfire fighting aerial operations person. So he's looking for what, back pay now? Correct. The charges against him were put in the local newspaper, right? That is correct, Your Honor. And could he effectively continue his job, which requires dealing with the public, when the public is aware of these criminal difficulties? There again, Your Honor, and I think this impinges or relates back to Judge Lurie's question. And our position is that there is underlying this or the animus driving this, and there's certainly ample circumstantial evidence from which the A.J. and the board should have determined that there was a basis to determine that a substantial contributing factor of this action taken against him in these suspensions. By the way, these suspensions terminated his career. Mr. McGill, by the way, acknowledges that in his testimony at pages, I believe, 602 and 603 of the joint appendix, that basically he would never earn another paycheck from BLM at that point. After the search, and that's a parenthetical fact here, after the search of his residence where many duffel bags worth of stuff were hauled out of there, they couldn't figure out what to charge him with for six months. And then here's a guy who would be called from home to go out to other states and fight forest fires because they found a GPS and they found- One GPS? One GPS for which he was charged. He didn't sign out. And then Mr. Edmunds' ID that Edmunds admitted that he hung up on a- that he sometimes left in various places. The fact is that this charge, that this search was, if you look at the search warrant, very questionable and based not on some objective and correctly maintained agency investigation where you were dealing with somebody who was actually committing crimes. Mr. Thompson, the AJ, said two GPS systems, a long-range telephone, binoculars, a telefax machine in excess of $1,000, the access card of the supervisor, and the airport security identification of the supervisor. That's more than just a GPS. Your Honor, I believe that eventually it was shown that only one of the GPSes was part of the criminal case, but there was an indictment that- I'm running out of my rebuttal time. Mr. Beckler was indicted for possession of agency documents that were disclosed to him in discovery in the MSPB case that was going to trial a couple of weeks later. Once that was called to the agency, to the U.S. Attorney's attention, it was a superseding indictment and that was the purpose for the superseding indictment later. But that gives you an idea of what's going on here, and I have a minute and 15 seconds left. We'll save your rebuttal time, Mr. Thompson. Thank you, Your Honor. Mr. Huston. Thank you, Your Honor. May it please the Court. This Court should affirm the Board's decision because there is substantial evidence to support the Board's determination that Bureau of Land Management, or the BLM, proved by preponderance of evidence, preponderant evidence, the elements necessary to sustain its indefinite suspension of Mr. Beckler. Additionally, the Board's decision that Mr. Beckler failed to prove his affirmative defenses of reprisal for whistleblowing, for filing complaints with the Office of Inspector General or the OIG, and for filing a Board IRA appeal is supported by substantial evidence and is in accordance with law. Under the Dunnington case, there are four elements that the BLM was required to prove in order to sustain its indefinite suspension. All of those elements were proved by preponderant evidence, and Mr. Beckler, upon appeal, does not challenge either the legal determination that these are the correct four elements or that there is preponderant and substantial evidence to support the administrative judge's decision that there was preponderant evidence that all four of these elements were established. But he gives the impression, in looking at the entirety of the circumstances, that there's something very strange about all of these things happening at this time while he was involved with the whistleblowing activity and the other activities, that if you put it together, it starts to look as if there's just too much coincidence to completely ignore. Well, Your Honor, I agree those are the allegations of Mr. Beckler. The administrative judge found the facts to be completely to the contrary. What happened to start the criminal proceeding, which is I think what Your Honor is asking about, was that in late summer, probably about September 5th of 2003, Mr. Bogner, who was an employee of the BLM, received at his office by UPS 11 videotapes of pornographic materials that were charged to his credit card. All right. Is that a prank we should overlook, or is that a serious case of identity theft? Well, that's not the identity theft charge. That is what started the criminal investigation. But I mean overall. Are we looking at just a prank among employees, or are we looking at more serious charges of identity theft? Well, the identity theft was a separate incident that had occurred a month earlier to a different supervisor when his ID was stolen. And I agree with Your Honor that the ID was stolen not because Mr. Beckler thought that he could use it somehow, but it was to harass the employee in some way, or I wouldn't call it a prank, but certainly for that purpose. I thought they were charging identity theft on the premise that it was the person who was the addressee of this material who had ordered it, and that was one of their reasons for the search of Mr. Beckler's home to find whatever credit card or whatever had been used. There are two different things, Your Honor. The pornographic materials were based upon an order form a Hustler magazine, and that's what led to the search in order to try to find evidence corroborating that it was in fact Mr. Beckler who signed for Mr. Boatner, B-O-A-T-N-E-R. Wasn't he charged with therefore identity theft in signing and ordering in someone else's name? No, he wasn't. He was never charged for that. Then why were they looking for his credit card in Mr. Beckler's personal materials if they weren't trying to sustain that asserted misrepresentation of identity? That was certainly the purpose of the search, and that is why the magistrate found that there was probable cause for the search, because they have, for example, a handwriting expert who said that the order form was probably Mr. Beckler imitating Mr. Boatner's signature. When they went to do the search, they did not find the Hustler magazine, the cutouts for the order forms. What they found during the search was something unrelated to that. Isn't it strange on an event such as this to get a search warrant? But for all the other events that were taking place, it's very hard to see this in any light other than perhaps very poor taste, but not a criminal act. Or pornographic materials to be sent to someone else. Well, to charge his credit card was about, I forget the amount, three or four hundred dollars worth of materials. And Mr. Boatner, who was the supervisor who received these materials, was very upset. Plus there had already been an investigation. Because they sent him a bill as well? I assume. But I didn't see that it was charged to him. Well, it was charged to his credit card. I assume somewhere he got the bill from the credit card company and said, no, this was not, I didn't order this, somebody else ordered this for me. But there had already been an investigation going on because several BLM employees, and this investigation started in 2002, had alleged that Mr. Becker had in fact was sending materials, subscriptions to their houses also. And so this was sort of corroborating what the special agent, Mr. Cornell, had already seen. You convene a grand jury because somebody has the poor taste to send pornographic materials to fellow employees? These are firemen out on the range. Pranks happen. Well, I don't know, mail fraud laws, I don't know whether it's a crime or not, but the point is he wasn't charged for that. What happened was when they went to the site, they found the stolen government property, they found the two GPS units, they found the Telefax machine, they found the long-distance telephone, they found the ID of another supervisor. But I thought it was established that at least most of that material, government property, was material that was used in firefighting and properly kept in the firefighter's home if he needed it. I'm not aware of any finding that it was properly kept. I'm not aware of a contrary finding either. I mean, it seemed to be silent. I mean, that's mentioned by Mr. Beckler. What the grand jury did was say that having that material, the grand jury indictment charged him with 10 years of potential imprisonment for having those materials at his home. It was a crime to have those materials at home. There was no basis for believing that he should have had those materials at his home. Mr. Austin, don't we take the indictment as a fact that we don't review? If there was an indictment, isn't it clear from the law that that provides reasonable cause for the action that was taken against him, irrespective of any whistleblowing allegations? Absolutely, Your Honor. That's absolutely correct. Under the Dunnington case, that element is established reasonable cause. All these allegations go to the affirmative defenses of Mr. Beckler. But you're absolutely right that the four elements, you do not look behind the reasonable cause established by the search warrant or the grand jury when it found that there was, in fact, probable cause to indict Mr. Beckler for three different crimes, one of which was potentially a 10-year prison sentence, two others for the theft of the ID badge of his supervisor, and for private documents of other employees. Now, what happens if he's acquitted? It really doesn't make any difference whether he's acquitted because the reasonableness of the indefinite suspension is based upon whether there's reasonable cause, as Your Honor indicated. Now, the conviction that was, in fact, the case here with Mr. Beckler confirms that there was reasonable cause. But Your Honor is absolutely right. You do not look behind the reasonable cause because that's a determination that was made by the grand jury. And as the administrative judge correctly said here, the criminal court doesn't look behind that determination. Therefore, there's no reason for the board to do so also. But in this case, what Mr. Beckler has done and said, well, let's look behind all that. And what the administrative judge said, you know, to what was the motivation for the search and the finding of the administrative judge or ignoring for the time being whether that could legally be a defense or not. As a matter of fact, that is not what motivated the agency in this case. As a matter of fact, it wasn't the whistleblowing. It wasn't the OIG complaints. It wasn't the board hearing that motivated the agency to start the criminal investigation. What it was was Mr. Beckler's receipt of the pornographic materials charged to his credit card that an expert believed was under the handwriting of Mr. Beckler and the confirmation by the investigators that other employees that had these same materials sent to them and that, in fact, Mr. Beckler had told his ex-wife that Mr. Boatner was going to receive some materials in his mail and he had better watch out for it. And those are the findings of fact by the administrative judge as to what motivated the investigation, assuming that it's relevant as a matter of law. But under the car factors for the affirmative defenses, there's three things that you look at. And the first thing that you look at is the strength of the agency's case. And the administrative judge here found correctly that the strength of the agency's case here was very strong for the same reason that the BLM met its affirmative obligation to prove the indefinite suspensions were justified, and that is that there was reasonable cause for the criminal indictments, that, in fact, the penalty was reasonable, that there was a nexus to the employment. The nexus to the employment was rather obvious, that the charges were government property that was stolen. It wasn't some extraneous event that had nothing to do with his employment. And finally, that there was an anticipated and stated termination, an ascertainable end of when the indefinite suspension would end, and that is that both Mr. Edmonds in his proposed letter and Mr. Gill stated that the indefinite suspension would end when the criminal proceedings terminated, and there would be a reassessment based upon whether there was a conviction or not or whatever the status of things were at that time. You're saying that a plea bargain is the same as a conviction? Well, Your Honor, I think that it's certainly not the same thing, but I think for our purposes, in other words, looking at whether the BLM met its case of showing that the indefinite suspensions were justified, I'm not sure the end result of the criminal proceedings are relevant at all. What's relevant is, for the first element, is whether the agency had reasonable cause to believe that a crime had been committed and that there was a possibility of jail time, and as Your Honor indicated, that was really, under the Dunnington case, dispositive by the existence of a grand jury indictment. The grand jury determined that there was probable cause that a crime subject to imprisonment had been probable cause that it may have occurred, and that is presumptive evidence, really irrebuttably presumptive evidence, that the agency couldn't look behind, just like a criminal court can't look behind. It may very well have supported the suspension, but had he gone through the trial and been exonerated, he would have gotten his job back and back pay, or whatever else happens if somebody is exonerated of a crime. Well, I don't know that he would have gotten back pay, Your Honor. At least there would have been no justification for removing him from the service. Well, he was never removed, Your Honor. That's what I was getting to. He chose to retire for whatever reason. Right. To do the indefinite suspensions, one of the elements is that there has to be an ascertainable end to the indefinite suspensions, and there was here because the agency said, as soon as the criminal proceedings are terminated, we're going to reassess and see where we are. What happened in this case is that he had already retired before the criminal proceedings ended, so there was no reason to come to that point. That reassessment was never done because his retirement was effectuated in December of 2005, retroactive to December of 2003, and the criminal proceedings at the trial level did not terminate until March of 2006. So that issue never arose, and it's not really relevant to whether or not the indefinite suspensions were necessary. That's what I would think, And yet I construed what you were telling us as if he had been convicted along the lines of the indictment, and that certainly is not accurate. He pled guilty, Your Honor, to counts two and three. He received one year of probation and a $2,500 fine, but the relevance of that to what would happen after the indefinite suspension was over never came up because of the early retirement. What was relevant for the purpose of the indefinite suspensions is only the evidence as it existed as of the time of the indefinite suspensions, which was the existence of both the original indictment and the superseding indictment. As counsel correctly indicated, the only difference was the elimination of two counts in two parts of three. Mr. Thomas makes a number of charges, of course. Are those charges mooted by the grand jury indictment? Are they removed by the grand jury indictment? How much does the grand jury indictment wipe clean the charges Mr. Thompson is making about activities before the indictment? I'm not sure I understand, Your Honor. The charges of whistleblowing? The various charges of misconduct, of vindictiveness, and all of that sort of thing. Well, as we indicated in our brief, the defense of selective prosecution is not an affirmative defense to a personnel action. It's only an affirmative defense to a criminal action, which the criminal court, the district court here, denied the motion. So it would be misjudicotic if there was such a defense, but there is not such a defense. Now, the substance of that defense was raised with respect to the affirmative defenses of whistleblowing, and the administrative judge, by clear and convincing evidence, rejected that and found that there was no action, retaliatory action, whatsoever. And I see that my time is up, and unless the court has any further questions, I will ask that this court affirm the decision below. Any further questions? Any further questions? Okay, thank you, Mr. Alston. And Mr. Thompson. Thank you, Your Honor. Let me ask, to rule in your favor, are we effectively saying that Mr. Gill lied when he gave his reasons? Your Honor, Mr. Gill facially says, greatly oversimplifying, obviously, but I think accurately here, you were charged with these offenses, you were in the newspaper for the first suspension, and he recites all of the other reasons. That ignores the fact that Bureau of Land Management employees, Bodner and even Gill, and this goes, I think, to one of our issues, and that is the confusion on the part of the A.J. as to the year that Gill was involved with the hearing. She says 2004. Gill admits in his testimony, and that's in our brief, and I can reference the specifics. It seems to be undisputed that it was 2003. It was. Although at one point in her very paper, she says 2003. Correct. But she basically says in her analysis that one of the reasons that Gill couldn't have had any animus or known about the pending Whistleblower Protection Act case in 2003 was he wasn't even there. Well, the fact is he actually was a witness in that case. He was not called, but he knew. And at Joint Appendix Pages 578 and 579, the agency, the hearing transcript page is 2001, but the appendix page is 578 and 579. He was asked by me, when did you first become aware that Dan Beckler had a Merit Systems Protection Board action pending against the BLM? I was on the original witness list, is the answer, for what I think you were talking about. I don't remember the date, and you could probably tell me later, but I did hear that he had filed a whistleblower action. I didn't end up being a witness, and I heard very little about it after that. The hearing, the witness for which he was a witness, was to occur on October 2-3, 2003. The search happened September 12, 2003. So I think that confusion alone warrants, I respectfully submit a remand, and for clarification of the record, or at least a proper review by Anne A.J. of that. One point I'd like to make as well, the search warrant that was obtained, was obtained as a result of information provided by basically two people. Mr. Boatner, who was a principal in the forthcoming trial on Whistleblower Protection Act issues, and Mr. Beckler's ex-wife, or former wife, former spouse, now divorced. And joint appendix page, I couldn't write the complete page down, so I'll find it, 426 at note 2, reveals that Mr. Beckler was precluded by the A.J. from calling Ms. Vorse, or Mark Bickham, who figured in the original case, or Special Agent Brian Cornell, who was the search warrant for Mark Bickham, at the hearing. So that's at page 426. But by that time, had the Ninth Circuit decided the question of the proprietary, proprietoriness? The Ninth Circuit had, Your Honor, but the final point I'll make, and I've got 18 seconds, is that constitutional issues with regard to the federal constitutional issues deriving from vindictive prosecution and selective prosecution can be raised on appeal for the first time. We'd submit that it was already raised, and we, in the final argument, I see that my time has expired, may I finish the thought? No, please finish the thought. And in our summation brief, following the hearing and the proceedings below, but this Court's decision in Sanders v. United States Postal Service, 801 F. 2nd, 1328, at pages 1331 and 1332 of 1986, decision of this Court's been cited subsequently, where this Court has said, even first raised on appeal constitutional issues such as this, if they are only possibly frivolous, this Court should address on their merits. That's Hendricks v. Department of Agriculture, and that's an unpublished case, and maybe I shouldn't cite it, but 1998, U.S. Applexus 17301, but slip pages 3 and 4, and that's a July 14, 1998 decision. Vindictive prosecution, selective prosecution, even if there is probable cause, there is still, prosecution still goes away if there has been these constitutional violations, either because the vindictive prosecution or selective prosecution was impermissibly based on an infringement of one's First Amendment rights or for due process purposes, and we brief these things. Then, under those circumstances, the prosecution goes away, and it doesn't matter whether there was traditional probable cause or not. So, this appears to be a case of first impression on this issue before this Court in terms of raising it as affirmative defense within the context of this type of merit system protection, but it was a Blorack case, and I've looked for others, and there aren't any, but we submit that this is an appropriate constitutionally based defense that overlays everything else and that the Board did not address the underlying facts and circumstantial evidence that showed that there really was something rotten in Denmark here. Thank you. Thank you. Any more questions? Can I just ask one question? Mr. Thompson, we're not done. It follows up on what you just said. In terms of the selective and or vindictive prosecution affirmative defense, your position is that applies in a civil context, not just a criminal context. Yes. We say that it would apply in this context, and one important thing is one of the arguments that's made by the government in its brief is that, in essence, I think the statement was BLM didn't bring the criminal charges against them. The grand jury did. Well, the fact of the matter is it's undisputed that the exclusive basis for the suspension was the institution of criminal proceedings, and once even the search had occurred, Mr. Becker was placed on paid administrative leave, and then four weeks or so later he was told, well, firefighting season's over, you're furloughed. But to get to this, and we cite it on page 40 of our brief at footnote 10, even a good faith decision by a prosecutor to continue a constitutionally tainted prosecution doesn't excise or exercise the utilization of these fruits of the tainted behavior by the investigative officers we're talking about here, by analogy to agency people such as Baltimore. So we were very disappointed we couldn't have Ms. Voris on the stand here. It might have provided an opportunity. Any more questions? Okay. The case is taken under submission. Thank you, Mr. Thompson, Mr. Austin. Thank you, Your Honor. Thank you.